## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **OGLALA SIOUX TRIBE** | ) | |
| P.O. Box 2070 | ) | |
| Highway 18, Main St. | ) | |
| Pine Ridge, SD 57770 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-_____ |
| | ) | **COMPLAINT** |
| **U.S. ARMY CORPS OF ENGINEERS** | ) | |
| 441 G Street NW | ) | |
| Washington, DC 20314-1000 | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiff Oglala Sioux Tribe (Tribe), a federally recognized tribe, for its causes of action against the Defendant named above, alleges as follows:

## INTRODUCTION AND SUMMARY

2.      This is a complaint for declaratory and injunctive relief to stop the construction and operation of the Dakota Access Pipeline (DAPL) until the Defendant United States Army Corps of Engineers (Corps) completes an environmental impact statement (EIS) that fully analyzes the impacts of the DAPL to the Tribe's Treaty rights and rights in the Mni Wiconi Project as required by the National Environmental Policy Act (NEPA) and the Mineral Leasing Act (MLA).

3.      DAPL is a crude oil pipeline that will carry up to 570,000 barrels per day.  DAPL would cross the Missouri River at Lake Oahe, north (upriver) of the Tribe's water intake that is

1

part of the Mni Wiconi Project.  The Mni Wiconi Project provides safe drinking water to the

Tribe's Pine Ridge Reservation as well as to the Rosebud Sioux Tribe, the Lower Brule Sioux

Tribe, and the non-Indian West River/Lyman Jones Water District in South Dakota.  The Mni

Wiconi Project has a service area of about 12,500 square miles and provides a reliable source of

potable water to a population of approximately 52,000 people, many of whom live on some of

the poorest Indian reservations in the United States.  The Oglala Sioux Rural Water Supply

System, a component of the Project, is held in trust for the Tribe by the United States.

4.     On July 25, 2016, the Corps issued some of the federal authorizations needed for

the DAPL to cross Lake Oahe.  Accompanying these authorizations, the Corps released a Final

Environmental Assessment (EA) and finding of no significant impact (FONSI) that wrongly

concluded that the Lake Oahe crossing did not have sufficient environmental impact to warrant

preparation of an EIS.  The EA/FONSI was deficient in many respects, including that it entirely

failed to consider impacts to the Tribe's Treaty- and statute-protected rights in the Missouri

River and in the Mni Wiconi Project and failed to provide a reasoned analysis of spill risks or

damage in the event of a spill.

5.     The Tribe and other tribes along the Missouri River filed objections to the

EA/FONSI and urged the Corps to conduct a full analysis of their statutory and Treaty rights in

the Missouri River, which had not been done to date. In December 2016, the Assistant Secretary

for the Army for Civil Works announced that the Army would conduct an EIS before granting

DAPL's owner the easement to cross Lake Oahe, and on January 18, 2017, the Army issued a

Notice of Intent (NOI) to prepare the EIS.  Days after taking office, however, on January 24,

2017, President Donald Trump ordered the Secretary of the Army to instruct the Assistant

Secretary of the Army for Civil Works and the Corps to consider rescinding the NOI and to

consider prior reviews, including the EA/FONSI, as fulfilling federal law.  The Department of the Army forwarded to the Office of the Federal Register a notice rescinding the NOI on February 7, 2017—almost two weeks prior to the deadline for public comment on the NOI—and the Corps granted DAPL the easement on February 8, 2017.

6.      The Tribe seeks a declaration that the EA/FONSI are inadequate and that the Corps must complete an EIS that analyzes impacts to the Tribe's Treaty rights and its rights in the Mni Wiconi Project as required by NEPA and the Mineral Leasing Act (MLA).  The Tribe also seeks a declaration that the Corps has breached its trust responsibility to the Tribe by failing to assess impacts to the Tribe's Treaty water rights and the Mni Wiconi Project.  The Tribe requests that the Court vacate the easement the Corps issued on February 8, 2017, and enjoin the Corps from issuing any further easements or other authorizations for the DAPL until an EIS is conducted that assesses impacts to the Tribe's rights.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution, laws, and treaties of the United States, including but not limited to the Treaty of Fort Laramie, 11 Stat. 749 (Sep. 17, 1851); the 1868 Sioux Nation Treaty, 15 Stat. 635 (Apr. 29, 1868); the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370f; the Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.*; the Mni Wiconi Project Act of 1988, 102 Stat. 2566 (Oct. 24, 1988), as amended[1] (Mni Wiconi Project Act); and the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*, which authorizes the Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §

---

[1] Pub. L. 103-434 (October 21, 1994); Pub. L. 105-277 (October 21, 1998); Pub. L. 106-53 (August 17, 1999); Pub. L. 107-367 (December 2, 2002); and Pub. Law 110-161 (December 26, 2007).

706(2)(A)–(B).  Jurisdiction also arises under 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States"; § 2201, which provides for declaratory relief; and § 2202, which provides for "[f]urther necessary or proper relief based on a declaratory judgment."

8.     Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391(e) because this is an action in which the Defendant is an agency of the United States and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## PARTIES

9.     Plaintiff Oglala Sioux Tribe is an Indian Nation that is part of the Oceti Sakowin (the Seven Council Fires), which is also known as the Great Sioux Nation.  The Tribe is federally recognized and maintains a government-to-government relationship with the United States of America.

10.    The Tribe is a party to the 1851 Fort Laramie Treaty, 11 Stat. 749, and the 1868 Sioux Nation Treaty, 15 Stat. 635.  The DAPL would run through lands that are the Tribe's aboriginal territory as well as its ancestral Treaty lands.  The Tribe, along with its sister Sioux Tribes, has rights to the water in the Missouri River based on the 1851 and 1868 Treaties.

11.    The current boundaries of the Tribe's territory, known as the Pine Ridge Indian Reservation, were created by the Act of March 2, 1889, 25 Stat. 888.  The Tribe's Reservation is downstream from Lake Oahe, where the DAPL threatens to cross the Missouri River.  The Tribe operates the Oglala Sioux Rural Water Supply System, a part of the Mni Wiconi Project, which

draws water from the Missouri River and provides drinking water to the Pine Ridge Indian

Reservation as well as to the Rosebud Sioux Reservation, Lower Brule Sioux Reservation, and

the non-Indian West River/Lyman Jones Water District.

12.     Defendant U.S. Army Corps of Engineers is an agency in the Executive Branch of

the Federal government and a division of the Department of the Army.  It is charged with

regulating any dredging and filling of the waters of the United States under § 404 of the Clean

Water Act and § 10 of the Rivers and Harbors Act.  It also has the authority to issue rights-of-

way or easements for pipeline purposes for the transportation of oil through federal land over

which it has jurisdiction under the Mineral Leasing Act.  30 U.S.C. § 185.

## RELEVANT LAW

### I.     THE 1851 FORT LARAMIE TREATY AND 1868 SIOUX NATION TREATY

13.     The Oceti Sakowin (The Seven Council Fires or Great Sioux Nation) is composed

of seven divisions of Lakota, Dakota, and Nakota speaking peoples.  The Oglala (Scatters His

Own) are one of the Lakota bands.

14.     In 1851, the United States signed the Treaty of Fort Laramie with several

divisions of the Oceti Sakowin, including the Oglala.  Treaty of Fort Laramie, 11. Stat. 749 (Sep.

17, 1851).  The 1851 Treaty of Fort Laramie was a peacetime Treaty.  The United States sought

the Treaty to facilitate westward migration, ensuring passage from the Missouri basin to the

West Coast.  In consideration for agreeing to allow the United States to build roads and outposts

within Indian lands, the United States agreed to "bind themselves to protect the aforesaid Indian

nations against the commission of all depredations by the people of the said United States."  *Id.*

at arts. 2–3.  The Treaty recognized 60 million acres as the territory of the Great Sioux Nation,

"commencing  the mouth of the White Earth River, on the Missouri River; thence in a

southwesterly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as the Red Bute, or where the road leaves the river; thence along the range of mountains known as the Black Hills, to the head-waters of Heart River; thence down Heart River to its mouth; and thence down the Missouri River to the place of beginning." *Id.* at art. 5. The Tribe and its members retained the right to access clean water in the several bodies of water within this territory reserved for their use, including the Missouri River and its tributaries.

15. After the United States violated the 1851 Treaty by allowing incursions by non-Indians settlers on Great Sioux Nation land, war broke out between the United States and the Great Sioux Nation. The United States sought to end this war by signing the 1868 Sioux Nation Treaty with several bands of the Great Sioux Nation, including the Oglala. Within the previously recognized 60 million acre Treaty territory, the 1868 Treaty further demarcated a 26 million acre reservation "for the absolute and undisturbed use and occupation" of the signatory tribes. Sioux Nation Treaty, 15 Stat. 6435, art. 2 (Apr. 29, 1868). That reservation was called the Great Sioux Reservation and included all of present day South Dakota west of the low water mark of the east bank of the Missouri River and adjacent lands in North Dakota. *Id.* The 1868 Treaty affirmed a permanent homeland for the Great Sioux Nation, reserving to the Nation, without limitation, rights to water, natural resources, self-government, and all other rights necessary to make the Great Sioux Reservation a livable homeland, which the United States pledged to protect.

## II.    THE ACT OF MARCH 2, 1889

16. After failing to uphold the terms of the 1868 Sioux Nation Treaty, the United States divided the lands of the Oceti Sakowin into separate reservations, creating the Pine Ridge Reservation for the Oglala Sioux Tribe. The Act of March 2, 1889 provided that the specified

"tract of land, being a part of the Great Reservation of the Sioux Nation, in the Territory of

Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and

annuities at the Pine Ridge Agency, in the Territory of Dakota."  25 Stat. 888 § 1 (Mar. 2, 1889).

17.     The creation of the Pine Ridge Reservation reserved, without limitation, rights to

water, natural resources, self-government, and all other rights necessary to make the reservation

a livable homeland.  This reservation of territory included a reservation of water rights in the

Missouri River.  As the Supreme Court articulated in *Winters v. United States*, the creation of an

Indian reservation impliedly reserves water rights to the tribe or tribes occupying the territory;

those water rights are reserved to carry out the purposes for which the lands were set aside; and

those rights are paramount to water rights later perfected under state law.  207 U.S. 564, 576–77

(1908).  The Tribe enjoys reserved water rights to the waters in the Missouri River and its

tributaries, including sufficient water to fulfill the purpose of the reservation to provide for a

permanent livable homeland.   The Tribe's reserved waters rights "are vested property rights for

which the United States has a trust responsibility, with the United States holding legal title to

such water in trust for the benefit of the Indians."  Notice, Department of the Interior, Working

Group in Indian Water Settlements, Criteria and Procedures for the Participation of the Federal

Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg.

9223, 9223 (Mar. 12, 1990).

## III.   THE MNI WICONI PROJECT ACT

18.     In 1988 the United States created the Mni Wiconi Project to provide safe drinking

water to the Pine Ridge Reservation and other Indian reservations, as well as to some rural

counties in South Dakota.  Mni Wiconi Project Act.  In the Mni Wiconi Project Act, Congress

issued the following findings:

(1) there are insufficient water supplies available to residents of the Pine Ridge Indian Reservation in South Dakota, and the water supplies that are available do not meet minimum health and safety standards, thereby posing a threat to public health and safety;

(2) Shannon County, South Dakota, one of the counties where the Pine Ridge Indian Reservation, Rosebud Indian Reservation, and Lower Brule Indian Reservation is located, is the poorest county in the United States, and the lack of water supplies on the Pine Ridge Indian Reservation restricts efforts to promote economic development on the reservation;

(3) the lack of water supplies on the Rosebud Reservation and Lower Brule Reservation restrict efforts to promote economic development on those reservations;

(4) serious problems in water quantity and water quality exist in the rural counties of Haakon, Jackson, Jones, Lyman, Mellette, Pennington, and Stanley Counties, South Dakota;

(5) the United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation, Rosebud Indian Reservation, and Lower Brule Indian Reservation; and

(6) the best available, reliable, and safe rural and municipal water supply to serve the needs of the Pine Ridge Indian Reservation, Rosebud Indian Reservation, and Lower Brule Indian Reservation and the residents of Haakon, Jackson, Jones, Lyman, Mellette, Pennington, and Stanley Counties is the Missouri River.

*Id.* § 2(a)

19.     Among the purposes of the Act are to "ensure a safe and adequate municipal, rural, and industrial water supply for the residents of the Pine Ridge Indian Reservation, Rosebud Indian Reservation and Lower Brule Indian Reservation in South Dakota," and to "provide certain benefits to fish, wildlife, and the natural environment of South Dakota, including the Pine Ridge Indian Reservation, Rosebud Indian Reservation, and Lower Brule Indian Reservation." *Id.* §§ 2(b)(1), (4).

20.     The Act directed the Secretary of the Interior to "plan, design, construct, operate, maintain, and replace a municipal, rural, and industrial water system, to be known as the Oglala Sioux Rural Water Supply System." *Id*. § 3(a).  The system was authorized to include, among other things, pumping and treatment facilities located along the Missouri River, pipelines extending from the Missouri River to the Pine Ridge Indian Reservation, distribution and treatment facilities to serve the needs of the Pine Ridge Indian Reservation, and such facilities as the Secretary of the Interior deems necessary or appropriate to meet the water supply, economic, public health, and environmental needs of the reservation.  *Id*. § 3(a).  The construction and operation of this water supply system is carried out by the Tribe pursuant to self-determination cooperative agreements with the Secretary of the Interior as authorized by the Act.  *Id*. § 3(h).  This water supply system was placed in trust, with the Secretary of the Interior maintaining management and control over the trust corpus.  The Act provides that the "[t]itle to the Oglala Sioux Rural Water Supply System shall be held in trust for the Oglala Sioux Tribe by the United States and shall not be transferred or encumbered without a subsequent Act of Congress." *Id.* § 3(e).

## IV.     THE FEDERAL TRUST RESPONSIBILTY

21.     The general federal trust responsibility originates from the United States Constitution, Treaties, and the unique government-to-government relationship between tribes and the United States.  The Supreme Court has acknowledged "the undisputed existence of a general trust relationship between the United States and the Indian people" that informs its interpretation of more specific statutes.  *United States v. Mitchell*, 463 U.S. 206, 225 (1983).

22.     Additionally, where legislation and regulations give "the Federal Government full responsibility to manage Indian resources … for the benefit of the Indians[, t]hey thereby

establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.* at 224. "Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over … property belonging to Indians." *Id.* at 225.

23.    Under the federal trust responsibility, the United States has a duty to conserve Indian lands, waters, and natural resources and to appropriately manage tribal natural resources. It is also the policy of the United States "that all Indian communities … be provided with safe and adequate water supply systems…" 25 U.S.C. § 1632(a)(5).

24.    The federal trust responsibility stretches across all components of the United States government. The Corps has a trust responsibility to manage and protect trust property on behalf of the Tribe based generally in the Treaties and statutes governing the Tribe and its Reservation and the general trust doctrine. The Corps has recognized the federal trust responsibility to tribes in the operation of the Mainstem Reservoir System, of which Lake Oahe is a part, and in its Tribal Consultation Policy. U.S. Army Corps of Engineers, Tribal Consultation Policy (Nov. 1, 2012) (stating in Section 5(b): "The Trust responsibility will be honored and fulfilled."). The Department of Defense, of which the Army and Corps are a part, has also recognized the federal trust responsibility. Department of Defense, "DoD Interactions with Federally-Recognized Tribes," Instruction No. 4710.02 (Sept. 14, 2006) (stating in Section 4.1 that it is the Department's policy "to [m]eet its responsibilities to tribes as derived from the Federal trust doctrine, treaties, and agreements between the United States and tribal governments….").

## V.    THE CLEAN WATER ACT

25.    The Clean Water Act (CWA) regulates discharges of pollutants into waters of the United States and the quality of surface waters. 33 U.S.C. § 1251 *et seq.* The CWA was passed

to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
*Id.* § 1251(a).  The CWA prohibits discharges of pollutants, including dredged soil or other fill,
into waters of the United States without a permit.  *Id.* §§ 1311(a), 1344(a)–(f).

26.     Section 404(e) of the CWA allows the Secretary to issue general permits relating
to the discharge of dredged or fill material.  *Id.* § 1344(e); *see also* 33 C.F.R. Part 330.  General
permits may be issued on a nationwide basis for activities that are similar in nature and "will
cause only minimal adverse environmental effects when performed separately, and will have
only minimal cumulative adverse effects on the environment."  *Id.* § 1344(e)(1).  Prior to issuing
a permit under Section 404, the Corps is required to conduct a public interest review.  33 C.F.R.
§ 320.4(a).

## VI.    RIVERS AND HARBORS ACT

27.     Section 10 of the Rivers and Harbors Act of 1899 (RHA) makes it unlawful "to
excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity
of" any navigable water without a permit from the Corps.  33 U.S.C. § 403.  Tunneling under
navigable waters requires a Section 10 permit from the Corps even when there will be no
discharge into navigable waters.  33 C.F.R. § 322.2(a).  A public interest review is required for
issuing a Section 10 permit.  *Id.* § 320.4(a).  Section 14 of the RHA, codified at 33 U.S.C. § 408,
and known as "Section 408," makes it unlawful to "build upon, alter, deface, destroy, move,
injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the
usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the
United States" without a permit from the Corps.  Prior to issuing a Section 408 permit, the Corps
must determine whether the use or occupation will be injurious to the public interest or impair
the usefulness of the project.  33 C.F.R. § 320.4(a), (g).

## VII.    THE NATIONAL ENVIRONMENTAL POLICY ACT

28.    NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), intended to assist the Federal Government "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; … [and] attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."  42 U.S.C. §§ 4331(b)(1), (b)(3).

29.    NEPA requires that environmental protection be considered in the interpretation and implementation of every federal agency mandate.  42 U.S.C. § 4332.  It ensures that "environmental review procedures…run concurrently rather than consecutively" with other federal laws and agency practice.  40 C.F.R. § 1500.2(c).

30.    NEPA imposes a mandatory procedural obligation on federal agencies to take a "hard look" at the potential environmental impacts of major federal actions before deciding to proceed with a proposed plan of action.  42 U.S.C. § 4332(C).  It is intended to foster "excellent action" by ensuring that high quality and accurate "environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b)–(c).  NEPA "guarantees that the relevant information [concerning significant environmental impacts] will be made available to the larger [public] audience that may also play a role in both the decision-making process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

31.    NEPA mandates that federal agencies prepare an EIS if an agency action may have a significant impact on the environment.  40 C.F.R. § 1501.4.  For the purposes of NEPA, an agency must consider "both context and intensity" in determining whether a proposed action

may have significant impact on the environment.  40 C.F.R. § 1508.27.  Context means that "the

significance of an action must be analyzed in several contexts such as society as a whole (human,

national), the affected region, the affected interests, and the locality."  *Id.*  Intensity refers to "the

severity of impact," which is determined based on, *inter alia*, the "degree to which the proposed

action affects public health or safety," "[u]nique characteristics of the geographic area," and the

"degree to which the possible effects on the human environment are highly uncertain or involve

unique or unknown risks."  40 C.F.R. § 1508.27(b)(2), (3), (5).

32.     NEPA defines the scope of "actions, alternatives, and impacts" that a federal

agency must consider in an EIS.  40 C.F.R. § 1508.25.  The EIS must consider direct, indirect,

and cumulative effects of the agency's proposed action and alternatives.  40 C.F.R. § 1508.25(c).

NEPA defines the "effects" of an agency action as including those impacts that are

"ecological…aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or

cumulative."  40 C.F.R. § 1508.8(b).

33.     If an agency has doubts as to whether an action's effects are significant, the

agency may prepare an environmental assessment to better inform its decision-making process.

40 C.F.R. §§ 1501.4, 1508.9.  If an agency determines that no EIS is required after a careful

analysis of the available scientific and environmental information, it must explain that

conclusion in a "finding of no significant impact" ("FONSI").  40 C.F.R. §§ 1501, 1508.13.

34.     The Council on Environmental Quality has advised that in some circumstances,

including in some cases where environmental effects on tribal resources are at stake, agencies

"should heighten agency attention to alternatives (including alternative sites), mitigation

strategies, monitoring needs, and preferences expressed by the affected community or

population."  Council on Environmental Quality, "Environmental Justice Under the National

Environmental Policy Act," at 10 (Dec. 10, 1997).

35.     An EA is insufficient where an agency's analysis is not more than a "conclusory

presentation [that] does not offer any more than the kind of 'general statements about possible

effects and some risk'" which have been "held to be insufficient to constitute a 'hard look.'"

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004)

(internal citation omitted).  An adequate EA must address the "unique characteristics" of a

proposed agency action, including any "issue of uncertainty" as to the project's potential impact

on the human environment and surrounding ecosystem, *Native Fish Soc'y v. Nat'l Marine*

*Fisheries Serv.*, 992 F. Supp. 2d 1095, 1109 (D. Or. 2014), and potential cumulative impacts to

avoid "impermissibly subject[ing] the decision-making process contemplated by NEPA to 'the

tyranny of small decisions'" that may otherwise result from a restricted EA analysis.  *Kern v.*

*Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002) (quoting the Council on

Environmental Quality, "Considering Cumulative Effects Under the National Environmental

Policy Act," at 1 (Jan. 1997)).

## VIII.    THE MINERAL LEASING ACT

36.     Section 28 of the Mineral Leasing Act (MLA), 30 U.S.C. § 185, known as Section

185, provides federal agencies with the authority to grant rights-of-way over federal lands for

pipeline purposes, including for oil and natural gas pipelines.  Section 185 imposes specific

environmental review and public hearing requirements, without altering the applicability of

NEPA.  30 U.S.C. § 185(h)(1)–(2).

37.     Under Section 185, if a right of way or permit has significant impact on the

environment, an agency must require the applicant to submit a plan of construction, operation,

and rehabilitation.  *Id.* § 185(h)(2).  Further, Section 185 requires the Secretary of the Interior or

"agency head" to:

> issue regulations or impose stipulations which shall include, but shall not be limited
> to: (A) requirements for restoration, revegetation, and curtailment of erosion of the
> surface of the land; (B) requirements to insure that activities in connection with the
> right-of-way or permit will not violate applicable air and water quality standards
> nor related facility siting standards established by or pursuant to law; (C)
> requirements designed to control or prevent (i) damage to the environment
> (including damage to fish and wildlife habitat), (ii) damage to public or private
> property, and (iii) hazards to public health and safety; and (D) requirements to
> protect the interests of individuals living in the general area of the right-of-way or
> permit who rely on the fish, wildlife, and biotic resources of the area for subsistence
> purposes.

*Id.*  The regulations are required to apply to every right-of-way or permit granted

pursuant to Section 185.  *Id.*

38.     Section 185 defines "agency head" as "the head of any Federal department

or independent Federal office or agency … which has jurisdiction over Federal lands.  *Id.*

§ 185(b)(3).  Section 185(k) requires that the Secretary or agency head by regulation

"establish procedures, including public hearings where appropriate, to give Federal, State,

and local government agencies and the public adequate notice and an opportunity to

comment upon right-of-way applications."  *Id.* § 185(k).

## IX.     ADMINISTRATIVE PROCEDURE ACT

39.     The Administrative Procedure Act authorizes courts reviewing agency actions to

hold unlawful and set aside final agency actions that are "arbitrary and capricious, an abuse of

discretion, or otherwise not in accordance with law" or that are "contrary to constitutional right,

power, privilege, or immunity."  5 U.S.C. § 706(2)(A)–(B).

40.    The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* at § 702.

## FACTUAL ALLEGATIONS

## I.    INTERESTS OF THE OGLALA SIOUX TRIBE

41.    The waters of the Missouri River are sacred to the Tribe.  These waters give life to all of the creatures and plants on the Tribe's lands.  The Tribe has Treaty- and statute-protected property rights to the waters of the Missouri River.

42.    The Tribe operates the Oglala Sioux Rural Water Supply System of the Mni Wiconi Project under a self-determination cooperative agreement entered into with the Secretary of the Interior pursuant to Sections 3(b) and 3(h) of the Mni Wiconi Project Act.  The Mni Wiconi Project provides clean drinking water to the Tribe's Pine Ridge Reservation as well as to the Rosebud Sioux Tribe, the Lower Brule Sioux Tribe, and non-Indian West River/Lyman Jones Water District in South Dakota.  The Mni Wiconi Project has a service area of about 12,500 square miles and provides a reliable source of potable water to a population of approximately 52,000 people, many of whom live on some of the poorest Indian reservations in the United States.  The Bureau of Reclamation in the Department of the Interior is the funding agency for the Project.  The Federal Government has invested at least $450 million in the Project to date and will continue to annually fund operations and maintenance costs.

43.    The Project draws water from the Missouri River, downstream from the easement granted for DAPL.  The Tribe is deeply concerned about the risk of a DAPL spill and the threat that the 570,000 barrels per day pipeline poses to its sacred Treaty- and statute-protected waters. A crude oil spill from the DAPL into Lake Oahe would damage the ecology of the river basin,

impair the Tribe's rights, and contaminate the drinking water of the Tribe's citizens. The Mni

Wiconi Project does not have the capacity to treat water contaminated by petroleum products,

and would have to shut down in the event of a spill, removing access to clean drinking water to

the 52,000 individuals it serves.

## II.     PERMITTING OF THE LAKE OAHE CROSSING

44.     In February 2012, the Corps issued Nationwide Permit (NWP) 12, governing

"utility line activities." 77 Fed. Reg. 10184, 10271 (Feb. 21, 2012). NWP 12 authorizes the

"construction, maintenance, repair and removal of utility lines and associated facilities" in waters

of the United States, and utility lines are defined to include "any pipe or pipeline for the

transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose." *Id.*

45.     Dakota Access has used NWP 12 to seek authorization of the DAPL. The DAPL

would pass through the Tribe's aboriginal, ancestral lands and would cross the Missouri River

under Lake Oahe, which is a dammed section of the Missouri River upstream from the Tribe's

Reservation. The DAPL will involve dredge and/or fill of navigable waters of the United States.

46.     In November 2015, the Corps issued a Draft Environmental Assessment (Draft

EA) for the DAPL. The Draft EA did not assess impacts to the Tribe's Treaty-protected water

rights or to the Mni Wiconi Project.

47.     The Corps received comments on the Draft EA from the general public and from

state and federal agencies. The Environmental Protection Agency (EPA) sent two comment

letters to the Corps. The first, dated January 8, 2016, stated as its main concern that the Draft EA

lacked sufficient analysis of direct and indirect impacts of DAPL on the Lake Oahe crossing on

water resources. The EPA specifically stated that the impacts from potential spills to water

quality must be analyzed and that emergency measures to detect, limit and respond to spills must

be addressed.  Further, the EPA stated that the water resources impacts section of the EA should be expanded to discuss affected water resources and potential impacts from construction and operation of the DAPL for the segment of the pipeline covered by the North Dakota EA.

48.     EPA's second comment letter on the Draft EA, dated March 11, 2016, recommended that the Corps prepare a revised Draft EA and provide a second public comment period based on the potential impacts to drinking water supplies along the Missouri River.  The EPA specifically mentioned concern for tribes downstream of the Lake Oahe crossing with public water supply intakes on the Missouri River, including the Oglala Sioux Tribe and the Mni Wiconi Project.  The EPA stated that based on the potential impacts, "[t]he revised Draft EA should disclose potential impacts to downstream water supplies from leaks and spills and include the water systems in emergency preparedness training."  The EPA also recommended that the Corp's NEPA analysis provide more information regarding detection and shutoff of the DAPL in the event of a spill or leak, consider alternative emergency detection systems, provide further information on its evaluation of alternate routes with reduced potential impact to water resources and drinking water supplies, and complete a more thorough environmental justice analysis.  The EPA also noted that consultation with affected tribal communities was limited to historic and cultural property concerns, and no tribes were listed as having been consulted as part of federal, state, tribal, and local agency consultation and coordination.

49.     The Standing Rock Sioux Tribe, whose reservation is downriver just one-half mile from the DAPL crossing, submitted comments on the Draft EA.  The Standing Rock Sioux Tribe stated that the Draft EA failed to adequately address potential impacts to Lake Oahe, and it urged the Corps to prepare an EIS, and to engage in consultation with it and other tribes, as required by law.

50.     On March 29, 2016, the Department of the Interior (DOI) sent a letter to the Corps requesting that it prepare an EIS, stating that "the potential impact on trust resources in this particular situation necessitates full analysis and disclosure of potential impacts through the preparation of the EIS."  DOI also concurred with the March 11, 2016 comments of the EPA.  Further, DOI also objected that the Corps had not adequately justified its conclusion that there would be no significant impacts on the surrounding environment and community.

51.     The Corps did not prepare an EIS.  On July 25, 2016, the Corps issued CWA and RHA authorizations and verifications that NWP 12 terms were met for the DAPL to cross Lake Oahe.  Accompanying this authorization, the Corps released a Final EA and FONSI.  The FONSI concluded that the Lake Oahe crossing would not significantly impact the human environment and that preparation of an EIS was not warranted.

52.     The Corps failed to consult with the Tribe on potential impacts of the project on the risk of spill and potential impacts to its Treaty protected water rights or the Mni Wiconi Project prior to issuance of the Final EA and FONSI.  The Final EA did not assess potential impacts to the Tribe's Treaty-protected water rights or statute-protected rights in the Mni Wiconi Project, nor did it include the Mni Wiconi Project or the Oglala Sioux Rural Water Supply System in its emergency preparedness planning.  The EA failed to address whether any of the proposed mitigation measures would mitigate such impacts.  Additionally, the EA's analysis was deficient in considering many aspects of the DAPL that are of concern to the Tribe.

53.     The EA contains a facially inconsistent and inadequate consideration of the proposed alternatives routes to cross the Missouri River.  The Corps initially considered crossing the Missouri River north of Bismarck, but abandoned that alternative after determining it would pose a risk to wellheads and water intakes that service the population of Bismarck, North

Dakota.  The EA justified abandoning that approach in part because the Bismarck route "crossed other populated PHMSA high consequence areas (HCAs), that are not present on the preferred (Lake Oahe) route."  In Table 2-1, where the EA compares the impact of a spill from the Bismarck alternative to the Lake Oahe alternative, the EA states there are no drinking water HCAs at the Lake Oahe crossing that would be impacted.  Yet elsewhere in the EA, the Corps notes that a worst case consequence scenario as a result of a spill at the Lake Oahe crossing would be ranked high "because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted."  The EA fails to adequately state or consider what those consequences might be, or whether they would constitute significant impacts to the environment.

54.     The EA fails to adequately compare the Bismarck alternative crossing with the Lake Oahe crossing by failing to adequately assess the risk a spill would have on the Tribe's Treaty- and statute-protected rights to drinking water in the Lake.

55.     The EA dramatically underestimates the total volume of oil that would likely be released in the event of a spill.  The EA is deficient in that it concludes that the most likely spill volume is 4 bbl or less.  But the data relied upon for that assumption includes spills from pipelines of all sizes, not spills from large diameter pipelines.  The EA indicates that the pipeline is designed to convey 570,000 bbl of crude oil per day, which converts to a throughput of approximately 400 bbl per minute, or 6.6 bbl per second.  The EA fails to explain why a spill of 4 bbl is "the most probable volume" for a spill from a pipeline with that capacity.

56.     The EA fails to explain why it limited its worst case discharge estimates to an hour long spill.  The EA fails to assess the risks of a spill longer in duration than a one-hour

event and fails to assess how long a spill could continue in the event the spill detection

technology DAPL plans to use fails to work, due an electrical shortage or otherwise.

57.     The EA fails to explain why its estimated one-hour spill event would result in

only 10,000 bbl of oil spilled.  With a throughput of 400 bbl per minute, a five minute spill

would result in a release of 2,000 bbl, an hour long spill would result in a release of 24,000 bbl,

and a 24-hour spill would result in a release of 570,000 bbl.  The EA includes a discussion of a

worst case discharge scenario in the facility response plan in Appendix L of the EA, but the

relevant portions of that plan are blacked out, and upon information and belief, those sections do

not adequately address risk of a discharge at the Lake Oahe crossing site or impacts to

downstream water users like the Tribe and the Mni Wiconi Project.

58.     The EA fails to explain why it considered benzene to be "commonly considered

to pose the greatest toxicity threat from crude oil spills" when a number of studies indicate that

crude oil itself, as well as its other constituent compounds like ethylbenzene, p-xylene and PAHs

are generally more toxic than benzene.

59.     The EA erroneously concludes there would be no significant impact by

comparing benzene concentrations that would result from a spill to an acute toxicity standard for

aquatic organisms and the EPA's drinking water standards, rather than against a more

appropriate No Observed Adverse Effect Level and the legally applicable standard benzene

contamination established by the states of North and South Dakota.

60.     The EA compares the risk of benzene contamination at the Lake Oahe crossing

against an Acute Toxicity Threshold for aquatic organisms of 7.4 ppm, which it claims is the

"lowest acute toxicity threshold for aquatic organisms."  The EA fails to state which organism

this threshold is based on.  The EA should have, but failed to use, the standard approach for an

ecological risk assessment using a concentration known as the No Observed Adverse Effect

Level (NOAEL), or in the absence of such a level, the Lowest Observed Adverse Effect Level

("LOAEL"). The NOAEL for benzene established by the Savanah River National Laboratory is

46 ug/l (which translates to 0.046 ppm). The National Oceanic and Atmospheric Administration

chronic concentration level for benzene is the same. At a throughput of 400 bbl per minute, a

spill of less than three minutes would result in 1,000 bbl spilled. The EA's estimated

concentration levels for benzene for a spill of 1,000 bbl (0.17 ppm) would far exceed the

NOAEL level of 0.046 ppm for benzene.

61.     Similarly, the EA uses the incorrect drinking water standard for benzene. It uses

an EPA maximum contaminant level (MCL) standard for drinking water of 0.005 mg/L, rather

than the applicable water quality standard for Lake Oahe contained in Section 33-16-02.1 of the

North Dakota Administrative Code of 2.2 ug/L (which translates to 0.0022 mg/L). The EA's

benzene spill contamination estimates for spills of 100 bbl, 1000 bbl and 10,000 bbl are all far in

excess of the applicable legal standard for benzene of 0.0022 mg/L. The EA's conclusion that a

spill would not pose any significant impact is legally deficient because the EA failed to measure

estimated contamination levels against the applicable legal standard, or even consider the

applicable legal standard.

62.     The EA failed to recognize that a spill would render the water of Lake Oahe and

the Missouri River unfit for human consumption and require remediation that would take months

or years to complete. Although the Corps did consider the risks to drinking water due to an

inadvertent spill, it relied on "site specific GRPs" (Geographic Response Plans) that were

submitted to the Corps as "Privileged and Confidential" and, therefore, were not part of the

public comment process. Upon information and belief, these site specific GRPs do not

adequately mitigate against the risks of a spill, and do not include the Tribe or the Mni Wiconi Project in any spill response planning.

63.     The EA states that in the event of a spill, Dakota Access would consider providing alternate sources of drinking water and/or shutting down intakes and using bottled water.  The EA fails to consider the feasibility, practicality, and the cost of providing bottled water to the 52,000 individuals who rely on the Mni Wiconi Project for drinking water.  The EA also fails to consider the cost a spill would have on water treatment facilities that currently do not have the capacity to treat for benzene or hydrocarbon contamination or the costs associated with providing drinking water to the individuals who would be without drinking water in the event of a spill.

64.     The EA fails to adequately assess how mitigation measures would reduce risk of spills.   The EA states that in the event of a spill, Dakota Access "would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact appropriate federal and state authorities to coordinate leak containment and cleanup activities."  These actions are insufficient to mitigate impacts associated with oil spills of the magnitudes that are well within the range of likely outcomes if a spill occurs.  Moreover, the EA simply lists mitigation measures without assessing whether and how those mitigation measures are effective and whether they would reduce the risk to a sufficient degree to avoid a significant impact.

65.     The EA fails to adequately consider risks to the pipeline from scouring of the lakebed and from landslide activity.

66.     The EA fails to provide two documents the Corps relied upon, the "Lake Oahe Spill Model Discussion Report" and the "Lake Oahe HDD Risk Analysis Report," and as a result critical information regarding spill modeling was not made available for the public to review.

67.     Additionally, the Corps never performed an EA for the easement itself.  The EA and FONSI deal exclusively with granting the Section 408 permissions.  The EA does not encompass the easement the Corps needs to grant for Dakota Access to drill under Lake Oahe pursuant to Section 185 of the Mineral Leasing Act.  According to the Corps, no further NEPA compliance actions are required prior to the District granting the Section 408 permission for the Proposed Action.  Yet the issuance of an easement under Section 185 is itself a "major federal action," triggering NEPA review.  *Sierra Club v. U. S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 31 (D.D.C. 2013).

## III.     SUBSEQUENT ADMINISTRATIVE ACTION

68.     On September 9, 2016, the Army, along with the Departments of Justice and Interior, issued a statement that there were "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members" regarding DAPL, and that the Corps "will not authorize constructing the [DAPL] on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under [NEPA] or other federal laws."

69.     The Tribe raised its concerns with the EA and FONSI in a September 25, 2016 letter to the President, Attorney General, Secretary of the Interior, and Secretary of the Army. The Tribe urged the denial of the easement, citing many of the deficiencies in the EA.

70.     The Tribe also raised its concerns with the EA and FONSI in a December 3, 2016, letter to Jo-Ellen Darcy, the Assistant Secretary of the Army for Civil Works.  This letter detailed

the Tribe's Treaty-and statute-protected rights and concerns with the EA/FONSI and was

accompanied by an independent expert evaluation of the EA that outlined several deficiencies of

the EA.

71.     After hearing the Tribe's concerns, and those of other tribes as well, the Corps on

December 4, 2016, stated that it would not grant the easement for the DAPL to cross Lake Oahe

on the then-current record and that it would prepare an EIS prior to granting the easement at the

Lake Oahe crossing.  The memorandum announcing the decision stated: "I have concluded that a

decision on whether to authorize the [DAPL] to cross Lake Oahe at the proposed location merits

additional analysis, more rigorous exploration and evaluation of reasonable alternatives, and

greater public and tribal participation and comments as contemplated in the CEQ's [NEPA]

implementing regulations, 40 C.F.R. §1502.14 and §1503.1."  It also stated that the "robust

consideration of reasonable alternatives that I am directing together with an analysis of potential

spill risk and impacts, and Treaty rights, is best accomplished… by preparing an Environmental

Impact Statement."

72.     On January 18, 2017, the Army published a Notice of Intent (NOI) to prepare an

EIS in connection with DAPL's request for the easement under Lake Oahe.  82 Fed. Reg. 5543

(Jan. 18, 2017).  The NOI provided that the comment period on the notice would end on

February 20, 2017, and that public scoping meetings would be announced at least fifteen days in

advance.  The NOI stated that the EIS would consider, at a minimum: (1) alternative locations

for the crossing, (2) potential risks and impacts of an oil spill to Lake Oahe and the Standing

Rock Sioux Tribe's water intakes, (3) the Standing Rock Sioux Tribe's Treaty rights in Lake

Oahe.

73.     On January 20, 2017, President Donald J. Trump took office.  On January 24,

2017, President Trump issued a memorandum entitled "Presidential Memorandum Regarding

Construction of the Dakota Access Pipeline."  The Presidential Memorandum directed the

Secretary of the Army to instruct the Assistant Secretary of the Army for Civil Works and the

Corps:

to take all actions necessary and appropriate to:

(i) review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL, including easements or rights-of-way to cross Federal areas under section 28 of the Mineral Leasing Act, as amended, 30 U.S.C. 185; permits or approvals under section 404 of the Clean Water Act, 33 U.S.C. 1344; permits or approvals under section 14 of the Rivers and Harbors Act, 33 U.S.C. 408; and such other Federal approvals as may be necessary;

(ii) consider, to the extent permitted by law and as warranted, whether to rescind or modify the memorandum by the Assistant Secretary of the Army for Civil Works dated December 4, 2016 (Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota), and whether to withdraw the Notice of Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, dated January 18, 2017, and published at 82 Fed. Reg. 5543;

(iii) consider, to the extent permitted by law and as warranted, prior reviews and determinations, including the Environmental Assessment issued in July of 2016 for the DAPL, as satisfying all applicable requirements of the National Environmental Policy Act, as amended, 42 U.S.C. 4321 et seq., and any other provision of law that requires executive agency consultation or review (including the consultation or review required under section 7(a) of the Endangered Species Act of 1973, 16 U.S.C. 1536(a));

(iv) review and grant, to the extent permitted by law and as warranted, requests for waivers of notice periods arising from or related to USACE real estate policies and regulations; and

(v) issue, to the extent permitted by law and as warranted, any approved easements or rights-of-way immediately after notice is provided to the Congress pursuant to section 28(w) of the Mineral Leasing Act, as amended, 30 U.S.C. 185(w).

74. The Acting Secretary of the Army, Robert Speer, on January 31, 2017, via memorandum instructed the Corps to "take all actions necessary and appropriate to full and unequivocally comply with the specific directives listed in subparagraphs (a)(i) thru (a)(v) of [Section 2(a) of the Presidential Memorandum]." Mr. Speer acknowledged in his Memorandum the "sensitive issues and legal challenges that lie ahead regarding the approval of the remaining easement" pursuant to the Mineral Leasing Act.

75. The Tribe submitted comments in response to the NOI. By letter dated January 30, 2017, the Tribe stated that the EIS should analyze DAPL's potential impacts on its Treaty-based and statutory rights in the Missouri River. It also resubmitted its comments on the deficiencies in the EA. The Tribe also submitted comments on February 7, 2017, to resubmit its September 25, 2016, letter for the record.

76. By memorandum dated February 7, 2017, the Senior Official Performing the Duties of the Assistant Secretary of the Army determined that "there is no cause for completing any additional environmental analysis. Therefore, I have determined that the ASA(CW)'s memorandum [of December 4, 2016, announcing the decision to prepare an EIS] must be rescinded." The Department of the Army forwarded to the Office of the Federal Register a notice rescinding the NOI on February 7, 2017 —almost two weeks prior to the deadline for public comment on the NOI— and the Corps granted DAPL the easement on February 8, 2017.

77. No scoping session on the EIS was held. Because the comment period was ended prematurely, the Tribe and the general public have been deprived of the opportunity to comment further on the proposed EIS.

## CAUSES OF ACTION

### I.     FIRST CAUSE OF ACTION: VIOLATION OF NEPA AND THE APA

78.     Plaintiff reincorporates the allegations in all preceding paragraphs.

79.     The EA failed to adequately address the potential impacts of the issuance of the easement and the construction and operation of the pipeline under Lake Oahe by, *inter alia*:

a.  not assessing the potential impacts to the Tribe's Treaty-protected water rights or rights in the Mni Wiconi Project, and not assessing whether any of the proposed mitigation measures would mitigate such impacts;

b.  failing to adequately explain why the risks posed to several wellhead source water protection areas in the North Bismarck route alternative caused the Corps to abandon that proposed route but not to abandon the Lake Oahe crossing route that would pose risk to the reserved water rights of federally recognized tribes using overly conservative estimates of spills and not explaining why its estimates are as conservative as they are;

c.  using the wrong standards to measure potential benzene contamination that would result from a spill;

d.  failing to consider that a spill could result in water that is unsafe to drink, if the correct standard and correct estimates of potential spills are used;

e.  failing to consider that a spill would render the water of Lake Oahe and the Missouri River unfit for human consumption and require remediation that would take months or years to complete;

f.  failing to include site specific GRPs (Geographic Response Plans) for public comment;

g.  failing to consider the efficacy of spill detection and prevention measures;

h. failing to consider or assess how listed mitigation measures would reduce the impact of a spill; and

i. failing to consider the cost a spill would have on water treatment facilities that currently do not have the capacity to treat for benzene or hydrocarbon contamination or the costs associated with providing drinking water to the individuals who would be without drinking water in the event of a spill.

80. The EA is internally inconsistent and does not demonstrate that the Corps has taken the requisite hard look at the impacts of the Lake Oahe crossing.

81. The EA was deficient, and the FONSI issued in reliance on it was arbitrary and capricious.

82. The construction and operation of the pipeline under Lake Oahe will have significant impact on the human environment, including but not limited to the Tribe's Mni Wiconi Project, due to the risk of spills and benzene contamination to drinking water. NEPA therefore requires that the impacts of the construction and operation of the pipeline under Lake Oahe be addressed in an EIS.

83. For these reasons, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of NEPA and the APA.

**II.    SECOND CAUSE OF ACTION: VIOLATION OF NEPA, THE APA, AND REGULATION**

84. Plaintiff reincorporates the allegations in all preceding paragraphs.

85. The Assistant Secretary's December 4, 2016, decision to prepare an EIS before deciding whether to grant the easement for the DAPL to cross Lake Oahe was reversed just days into the Administration of President Trump as a direct result of the Presidential Memorandum issued by President Trump on January 24, 2017. The Presidential Memorandum directed the

Corps "to review and approve in an expedited manner" the easement and any other necessary federal approvals.   Although this directive, and the accompanying directive to "consider … whether to rescind or modify" the decision to prepare the EIS, was couched using language "to the extent permitted by law," the Presidential Memorandum essentially directed the Corps to approve the easement, and cabined its discretion.   Had the officials empowered with making a decision on the easement or the EIS decided not to issue the easement or to proceed with the EIS they would, on information and belief, have been fired (as was Acting Attorney General Sally Q. Yates on January 29, 2017, when she stated that she said that the Department of Justice would not defend the Trump Administration's Executive Order entitled "Protecting the Nation Foreign Terrorist Entry into the United States" in court).   The Presidential Memorandum inappropriately interfered with the Corps' process, ultimately resulting in a reversal of the decision to prepare an EIS that was to specifically analyze alternative routes for the DAPL and the DAPL's impacts on Treaty rights.

86.     Corps regulations implementing NEPA provide: "If it is determined that an EIS is not required after a notice of intent has been published, the district engineer shall terminate the EIS preparation and withdraw the notice of intent."  33 C.F.R. Part 325, Appendix B, § 8(g).

87.     The Corps erred in concluding that an EIS was not required because the grant of the easement and the construction and operation of the pipeline will cause significant impacts to the environment and to the Tribe's Treaty and statutory rights.

88.     The Corps' decision to withdraw the NOI for the EIS before the end of the public comment period and without holding a scoping session violated NEPA.

89.    For these reasons, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of 33 C.F.R. Part 325, Appendix B, § 8(g), NEPA and the APA.

### III.    THIRD CAUSE OF ACTION: VIOLATION OF MINERAL LEASING ACT AND THE APA

90.    Plaintiff reincorporates the allegations in all preceding paragraphs.

91.    The Corps has also failed to fulfill the independent environmental review requirements under Section 185 of the Mineral Leasing Act by failing to assess risks to the Tribe's Treaty-protected water rights and rights in the Mni Wiconi Project.

92.    Assuming the Corps relied on the EA as meeting the requirements of Section 185, such reliance was arbitrary and capricious and in violation of law.  The EA was not intended to meet the requirements of the MLA and, in fact, it did not meet the requirements of the MLA.

93.    The stipulations required by the MLA that, *inter alia*, "insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards," "prevent [] damage to the environment," and "hazards to public health and safety," 30 U.S.C. § 185 (h)(2), are not met by the easement granted to DAPL on February 8, 2017, to cross Lake Oahe, because it relies on the EA, which is itself defective and arbitrary and capricious.

94.    For these reasons, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the MLA and the APA.

### IV.    FOURTH CAUSE OF ACTION: BREACH OF TREATY RIGHTS AND THE APA

95.    Plaintiff reincorporates the allegations in all preceding paragraphs.

96.     The United States holds the title to the Tribe's Treaty rights to Missouri River water in trust.  Because the federal trust responsibility runs across all parts of the Federal Government, the Corps is also responsible for upholding the United States' trust obligations.

97.     The Corps has breached its trust obligations to the Tribe by failing to ensure compliance with federal law in authorizations for the DAPL, which threaten the Tribe's Treaty-based reserved water rights.

98.     For these reasons, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of trust responsibility and the APA.

**V.      FIFTH CAUSE OF ACTION: BREACH OF TRUST, MNI WICONI PROJECT ACT, AND THE APA**

99.     Plaintiff reincorporates the allegations in all preceding paragraphs.

100.    The United States holds the title to the Oglala Sioux Rural Water Supply System of the Mni Wiconi Project in trust for the Tribe.  Because the federal trust responsibility runs across all parts of the Federal Government, the Corps is also responsible for upholding the United States' trust obligations.

101.    The Corps has breached its trust obligations to the Tribe by failing to ensure compliance with federal law in authorizations for the DAPL, which threaten the Tribe's rights in the Mni Wiconi Project.

102.    For these reasons, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of trust responsibility, the Mni Wiconi Act, and the APA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court grant the following relief:

1. Declare that the EA/FONSI are inadequate because the Corps failed to conduct a full EIS that analyzed impacts to the Tribe's Treaty-protected water rights and rights in the Mni Wiconi Project and failed to make a reasoned analysis of the risks and potential impacts of a spill;

2. Declare that the Corps has breached its trust responsibility to the Tribe by issuing an EA/FONSI without assessing impacts to the Tribe's Treaty rights and rights in the Mni Wiconi Project;

3. Declare that the Corps has violated the Mineral Leasing Act by failing to fulfill its independent environmental review requirements;

4. Vacate the EA/FONSI;

5. Enjoin the Corps and direct it to vacate the easement issued on February 8, 2017, and any rights-of-way for DAPL on lands within the Corps' jurisdiction;

6. Enjoin the Corps from allowing Dakota Access to drill under Lake Oahe until such time as a full EIS is completed that assesses impacts to the Tribe's rights;

7. Retain jurisdiction over this matter to ensure that the Corps complies with the law;

8. Award Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

9.   Grant such further and additional relief as the Court may deem just and proper.


Respectfully submitted,


s/ *Michael L. Roy*
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
2120 L Street NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-2968834   (Fax)
Attorneys for the Oglala Sioux Tribe


Mario Gonzalez
Gonzalez Law Office
522 7th St 202
Rapid City, SD 57701
(605) 716-6355
Of Counsel for the Oglala Sioux Tribe


February 11, 2017